Fahey, Elizabeth M., J.
This is a wrongful death action brought by The Estate of Jacob Freeman (“The Estate”) by Lisa Klairmont and Michael Freeman, Administrators of the Estate. This court took under advisement the Plaintiffs’ c. 93A claim. The court now issues its Findings of Fact and Rulings of Law and, based on these, enters judgment in favor of the plaintiffs on the c. 93A claim.
FINDINGS OF FACT
On March 31, 2007, Samuel Freeman (aka “Jacob”), age 21 and a Northeastern University student, went to a party at 214 Hemenway Street at approximately 9:30 p.m., where he met a friend, Al-eksandra Kaplan, who was 18 years old and also a Northeastern student. They both participated in a drinking contest, “flip cup,” in which the participants race to see who drinks fastest the beer in a small plastic cup. Jacob left that party at approximately 10 p.m. with friends and went to the Cask ‘n’ Flagon where he drank several (3-4) “Jack and Cokes,” a mixture of Jack Daniels and Coke. They left there at approximately 12:30 a.m. on April 1, 2007 and then went to Our House East (“Our House”). Jacob and three friends arrived shortly after 12:30 a.m. and stayed in the bar until 1:45 a.m., where it was crowded and fairly dark. They ordered and were provided with two beers each.[1] One or more of them paid for these drinks. Notwithstanding all of this alcohol during this evening, Jacob did not exhibit any signs or symptoms of intoxication that any of his friends or personnel at Our House recognized.
On April 1, 2007, the date of the incident at issue, Defendant Gainsborough Restaurant Inc., d/b/a Our House East, owned and operated Our House, located at 50-54 Gainsborough Street, Boston, Massachusetts. Defendants Holli P. Vara and Franklin E. Melgar, as they are Trustees of the 50-58 Gainsborough Street Realty Trust, owned the land and building structures within which Our House operated. Our House leases the premises from the Defendant 50-58 Gainsborough Street Realty Trust (“The Trust”), which has owned the building within which Our House is located since 1981.
Our House occupies three bays (i.e., #50, 52 and 54 Gainsborough). The middle bay houses the main bar and the kitchen; the kitchen is at the far end of the bay and is accessed by a hallway which leads to an exit (not an emergency exit) at the rear of the building. The person assigned as dishwasher often stands in the hallway facing the open kitchen to wash dishes at the sink. To the left of the hallway, just before it ends, is a small “alcove” at the end of which is a glass-door refrigerator, which is adjacent to the exit door. At the opposite end of the alcove from the refrigerator are the stairs leading down to the basement; between the refrigerator and the vinyl strips (at the top of the stairway) is the “alcove.” This “alcove” is quite small, so small that a person standing in it would *369 likely need to move for another to open the refrigerator. Vinyl strips, of various shades of gold, orange and green, hang over the opening to the stairs which were installed only for temperature control. The vinyl strips hang from the top to the bottom of the open doorway. The staircase leading to the basement did not have a door; the open doorway was filled with these vinyl strips.
The vinyl strips at the threshold to the stairs were opaque if there was darkness behind them but would be somewhat translucent if there was light behind them. At the time of Jacob’s fall, the stairs were not visible through the vinyl strips because of the lack of lighting over the stairs as well as the presence of grease and dirt on the vinyl strips. There was no landing at the top of the stairs behind the vinyl strips which were at or very close to the edge of the top step.
The bay on the left is the pub or the side bar where a DJ performs at night. A sit-down dining area for the restaurant occupies the right bay. On the night of March 31, 2007—April 1, 2007, the dishwasher was Carlos Betancur, the night manager was Paul Benko, and one of the bartenders on duty was Phillip Hunt. Mr. Benko was also Jacob’s fraternity brother and friend. The bar had its “last call” for drinks before closing at 1:45, at which time the bar was very crowded and noisy.
At approximately 1:30 a.m. Jacob and his friends decided to leave Our House. Jacob retrieved their coats from behind the juke box in the back bar.
At 1:45 a.m., Jacob received a call on his cell phone from another Northeastern student and he walked from the bar area into the hallway leading to the rear exit. This hallway is only several feet wide and about twice as long. I infer Jacob was seeking a quieter place to take his call. Aleksandra Kaplan, on the other end of the call, found it “not too noisy” in the background. This rear exit is not an emergency exit but a second means of egress for that bar/restaurant, which is available to the public per the defendant’s license.
Jacob walked along the hallway towards the rear exit door. On the right side of this hallway (facing the rear exit door) is the open kitchen; on the left side of this hallway is a wall. For the first few feet, the wall on the left is closer to the kitchen; the left wall then stops and an open doorway, obscured with the hanging vinyl strips, is perpendicular to that left wall. After this open doorway, which is approximately 34" wide (the same width as the vinyl strips), the left wall then continues but is set back the width of the doorway, creating the “alcove” referred to earlier.
The bar’s customers frequented this hallway and alcove near the stairs to use their cell phones, which was known to the management of Our House. At least several times each night, when the bar was crowded, customers would enter the hallway in order to use their cell phones. It was also known to the bar’s management prior to Jacob’s fall that patrons would frequent the area close to the stairs on both sides of the phone mounted on the wall. Sometimes the presence of the dishwasher in that hallway would deter patrons from entering that hallway; sometimes Our House staff would direct patrons to clear the hallway alcove. None of that occurred when Jacob entered.
At the time Jacob fell, there were no written warnings informing patrons that the hallway, alcove or stair area were off limits. There were no posted warnings concerning the stairs. It was undisputed that the basement was used for storage and supplies and was generally an employee only area. Non-employees accessed the basement to management’s knowledge but only rarely and only or to confer with either Mr. Hague or Mr. Benko.
On April 1,2007, Jacob accessed the hallway at the top of the staircase, including the alcove, which area was accessible to the public by the defendants’ entertainment license. I infer that, while on the phone, Jacob stepped from the alcove into the strips (likely backwards or sideways), not realizing there was an open staircase behind the vinyl strips. I accept that, until he began to fall, he had no knowledge of the presence of the staircase directly behind the vinyl strips.
Shortly after Jacob fell, the dishwasher, Carlos Betancur, moved the vinyl strips and saw Jacob lying face up on the floor at the base of the basement stairs. Because the basement then was dark, Betancur did not see Jacob at the bottom of the stairs until he had moved the strips in order to access the staircase. Jacob’s eyes were closed and he was bleeding; his feet were on the steps near the bottom of the staircase. After observing Jacob at the base of the stairs, Mr. Betancur found the Night Manager, Paul Benko, who both called the police at 1:48 a.m. and notified Jacob’s friend Rob McDowell of his fall.
Scattered about the floor of the basement, some feet behind Jacob, were his cell phone, the cell phone batteiy, cell phone cover and a broken beer bottle which Jacob had been holding. I infer that the bottle and cell phone broke into these pieces due to the impact of falling/being thrown out of Jacob’s hands during his fall. Jacob had also been holding his jacket, which also landed in the basement, at the bottom of the 2x4 “railing.”
Ambulance personnel arrived and transported Jacob to the Boston Medical Center. As a result of his fall, Jacob suffered a basal skull fracture and subdu-ral hematoma to his brain. Approximately fifty minutes after the incident, a blood serum alcohol reading was taken from Jacob which measured at 0.246. Applying established scientific procedure, Dr. Lukas equated the 0.246 blood serum alcohol level to a 0.208 blood alcohol level.
*370 Jacob was declared dead on April 3,2007, the cause of death being blunt trauma to his head with fractures of his skull and injuries to his brain.
Jacob did not suffer any bruises on the front of his torso or on the back of his body other than a lateral belt line bruise on his back and a small bruise on his right shoulder.
The stairs where Jacob fell are made of wood, with plastic mats over the center portion of the treads. Only one “railing,” literally a 2 inch x 4 inch piece of wood, was present on the left (when viewed from the top) side of the stairs. There was no railing on the other side.
The stairs where Jacob fell had narrow treads (back to front). Due to the narrowness of the treads, those using the stairs sometimes had to angle their feet to be able to safely use the stairs. At the time of Jacob’s fall, the basement stairs were worn and gouged, which management knew. Despite the wear and tear, the treads were not repaired in the entire 12 years that Manager Paul Benko worked at the bar.
At the time of Jacob’s fall, the basement was dark and there was no lighting over the basement stairs. Although numerous photos were offered of the stairs and the basement, none show any light fixture above or even near or on the stairs. The basement has several fluorescent lights but none are veiy close to the stairs. Paul Benko, the night manager, was already on the street level; I infer that lighting in the basement was already off when, or immediately after, he came to the first floor for “last call,” because Bentacur did not see Jacob until he had moved the vinyl strips. At the time Jacob fell, the lighting was also off in the glass refrigerator across from the vinyl strips.
Before Jacob fell, Our House’s Manager and shareholder Hemy Vara III was warned 3-5 times, by a bar/kitchen manager that: the stairs needed to be fixed, a door was needed at the top of the stairs and new stair treads needed to be installed or someone would get hurt.
I accept that prior to Jacob’s fall, management employees of Our House had been informed that two other individuals had fallen on the stairs. One such individual was a liquor distributor representative and another was a Kitchen Manager. Before Jacob fell, other employees of Our House had also fallen down the stairs but did not report their falls or injuries to management, fearing they would lose their jobs. I accept that management had no knowledge of these falls by employees, other than the Kitchen Manager’s fall.
One does not need to be a Building Inspector or even terribly familiar with the Building Code to realize that the staircase at issue is not Code compliant. Photographs taken by the police within a couple of hours of Jacob’s fall show that the stairs treads are uneven, are chipped, gouged and cracked both in the wooden treads and the mats covering portions of each tread. The steps begin right under the vinyl strips. The photos also show the 2x4 railing, the absence of a second railing and the absence of a landing at the top of the stairs. Any reasonable person observing these stairs in 2007 and before would conclude this staircase is an accident waiting to happen and is not Code complaint.
The dangers that the stairs posed to anyone using these stairs were also known to the bar management and to both defendants. I accept that any reasonable person looking at these stairs would realize they are a safety hazard[2] in terms of lack of required handrails, absence of a door, absence of lighting and absence of a landing. I accept that these stairs in these unsafe conditions are especially a safety hazard to anyone who does not already know of the presence of this staircase.[3]
I do not credit the defendants’ claim that Jacob fell backwards while walking up the stairs. I accept that he fell by walking backwards (or sideways), even a single step, through the vinyl strips, not realizing there was a descending staircase immediately beyond the vinyl strips. I accept that he then tried somehow to compensate for falling through the air but his efforts were unavailing.
Although common sense rather than any expert analysis satisfies me concerning the occurrence of Jacob’s fall, what is critical for me is that Jacob fell because he did not know of the presence of the staircase. The vinyl strips could not be seen through if it was dark behind them (which is the scene of Jacob’s fall); there was no door to the stairs; there was no landing behind the vinyl strips. In addition, although he was carrying a phone, his jacket and a beer, the absence of a second railing likely contributed to the seriousness of his injury. I accept that whichever scenario occurred (of Dr. Hayes’ four scenarios), Jacob fell and suffered a fatal injury because the stairs were in an unsafe, defective condition, having been built and rebuilt without the necessary Building Permits and not in compliance with the State Building Code.
I accept that none of these conditions of the stairs, lack of lighting, lack of door, complete absence of one railing and an improper 2x4 railing on the other side, would have been present if the defendants had obtained the necessary building permits in the early to mid 1980s and 1998 when they built and rebuilt these stairs. I also accept that each of these conditions, lack of lighting, lack of door, complete absence of one railing and an improper 2x4 railing, each likely contributed to Jacob’s fall.[4]
I accept that Jacob was approximately 6 feet in height. I accept that there is a head wall five feet nine inches over the second stair from the bottom. Due to the lack of substantial physical injury on Jacob other than his skull fracture, I accept that Jacob did not hit this head wall during his fall except at his waist, causing the lateral belt line bruise. I accept that, when *371 he realized he was falling, he extended one or both arms to reach an expected railing, thus bending forward at his waist which explains why his waist contacted the head wall over the bottom portion of the staircase.
I accept that Jacob was an experienced drinker and had, before March 31, 2007, built up a serious tolerance to alcohol.[5] Given the amount of alcohol Jacob consumed on the evening of March 31, 2007—April 1, 2007, I accept that Jacob was under the influence of alcohol prior to and at the time of his fall. His tolerance and “habituation to alcohol” likely caused him to not exhibit the usual impairments (slurred speech, glassy eyes or impaired gait) of alcohol.
I accept that plaintiffs presence at Our House was as a customer; defendant had provided him two beers for which it had been paid.[6] Jacob’s presence in the alcove and then over the stairs and at the bottom of the stairs was a most unfortunate aspect of his patronage of the defendants’ premises but it was part of this “commercial transaction.”
When the defendant Trust purchased the building in 1981, the current stairs into the basement from the first floor did not exist. I credit the testimony of the son of the former owner, from whom the defendant Trust purchased the liquor license, that there were no stairs from the first floor to the basement when the defendant purchased this building. The basement stairs were first constructed by the defendants in the early to mid 1980s after the building was purchased by the Trust. The stairs were built by the defendants without obtaining any Building Permit from the Cily of Boston and were not built in accordance with the Building Code then in effect. The basement stairs were then completely rebuilt, including structural supports, in approximately 1998. This reconstruction work on the stairs to the basement in 1998 was again done without obtaining any Building Permit and was not done in compliance with the State Building Code.
The construction and reconstruction of the stairs were done with the knowledge, permission and authorization of the Defendant Trust. When the stairs were built and re-built, the work required a Building Permit from Boston Inspectional Services Department (“ISD”) but on neither occasion were building permits obtained or even sought by either defendant. I also accept that this was known and accepted by both defendants, both of which knew that Building Permits were required. I decline to accept defendants’ contention that any Permits which were obtained are “missing” from the ISD records. Given the voluminous records which ISD produced for this properly, I decline to accept this unlikely “coincidence” (i.e. that the only missing records would be the applications for and permits relative to the building of these stairs).
The State Building Code at all relevant times (at the time of the construction of the stairs in the early to mid 1980s and at the time the business expanded to 54 Gainsborough Street in 1984 and at the time the business expanded to 50 Gainsborough Street in 1987 and when the stairs were completely rebuilt with structural supports in late 1998) required the staircase to be equipped with a self-closing fire-rated door at the top of the stairs, compliant riser and tread dimensions[7] with uniformity within limits set by the State Building Code, and compliant hand rails on both sides of the staircase. I accept that adequate lighting is also required. All of these Code requirements were missing from the subject staircase at the time of Jacob’s fall. This evidence of non-Code compliance was uncontradicted at trial as the defendants did not present any expert testimony on the Building Code issues. In addition, the juiy found, in an advisory opinion, that the defendants violated the Building Code.
I do not credit the testimony of the President of Our House, Henry Vara III, that he relied on contractors to obtain building permits. Since he worked there daily and was involved since the early to mid 1980s in the operation of Our House, he would have ample personal knowledge of the absence of a posted permit. There would be ample ISD inspections, cancelled checks and other documents of obtaining a permit, if any permit was obtained. No such evidence was offered. Both defendants were familiar enough with the Building Code to know that, at all relevant times, Building Permits are required for the addition of, and rebuilding of, a staircase in a building. This conclusion is supported by the ample evidence in the record showing the defendants’ knowledge of the need to obtain building permits for a variety of repairs for this property and other matters as well as their familiarity with the application process.
Defendants did present evidence regarding repeated health and fire department inspections of the premises over the years, mostly egress inspections, and did proffer Code provisions documenting an obligation by ISD to include any violations of the State Building Code which the inspectors observed. I also accept that these numerous fire and health inspection officials from the City of Boston who over the years inspected aspects of this property never once complained in writing of any problem with this staircase to the basement. It appears that only one problem was noted during any inspection. On April 9, 1987, an Inspector’s Violation Report issued to Patricia More-land (then Levins), Trustee for violation of State Building Code 113.1 for failing to secure a permit to change the occupancy of the building (from a take-out restaurant to a restaurant for on premises consumption). This Report is further evidence that both defendants, working out of the same office space, learned no later than 1987 that an ISD permit is necessary to change the use and occupancy of a premises. The Estate’s own Building Code expert, Walter Adams, conceded that building inspectors were charged with inspecting the *372 premises for Code compliance and he estimated that 12 to 14 inspectors had likely inspected the premises in the past. Most significantly, Mr. Adams, who had worked at ISD, stated that in his opinion the inspectors who worked for ISD would have had to issue a citation if they saw a condition related to egress and deemed it hazardous. Jack Hague, the day time manager at Our House from at least 1982 to the present, who worked every day excluding Sunday, testified that during the entire time he was present, no one ever specifically inspected the stairs where Jacob fell. I accept that this is basically the reason the obvious defects in the staircase were never cited by any of these inspectors. However, the numerous failures of these inspectors to note a deficiency which they were not specifically inspecting do not negate Defendants’ failures to build and rebuild the stairway with a valid Building Permit and according to the requirements of the State Building Code.
I accept that both defendants were well aware that the stairs were built and rebuilt without a building permit and that, at all relevant times, these defendants knew that building a staircase requires a Building Permit and must be built according to the Building Code then in effect.
Given this knowledge by these defendants at the time the stairs were built and rebuilt, the lack of further complaint by the City does not inure to the defendants’ benefit. I accept that these annual “egress” inspection certificates cannot waive, correct, modify or negate the defendants’ knowing and intentional Code non-compliance.
I accept that the defendants, knowing a bar/restaurant is in the premises and that alcohol will be served and imbibed by many of its patrons, have an obligation to act reasonably to provide their customers with a safe bar/restaurant. For their business and for the safely of their patrons, who may be expected to consume alcohol, it is especially important that the building, including stairs, be in conformity with the Building Code. Instead, the defendants built and rebuilt the stairs without obtaining any permit; one defendant then rented out the premises to the bar/restaurant and the other defendant operated the bar/restaurant.
In addition, the defendants operated Our House without obtaining the required “change in use” from the City of Boston Inspectional Services Department. At the time the property was purchased by the Defendant Trust, the prior uses at 50 and 54 Gainsborough were beauty salon, florist and laundromat. I accept that expansion of the bar into the two other bays is, if legally permitted, a more hazardous use than the prior uses of salon/florist/laundromat and that the defendants would have been required, due to any approved changes in use, to bring the entire premises up to the requirements of the State Building Code in effect at the time. The defendants intentionally failed to obtain these legal changes in use, and thereby intentionally evaded this upgrade requirement.
I do not credit the testimony of Dr. Piziali or Dr. Taub.
I accept that the defendants, which ostensibly are separate entities, are, in effect, interrelated businesses. While Vara III is owner now of Our House, Vara, Jr. is his father and Holli Vara is his sister. The lease in effect between these two defendants includes the basement; the lease dated January 1, 1990 is for 25 years and states a rent of $36,000.00 per year. No records exist of what, if any, rent was paid between 1981-1991; between 1999-2007 Our House did not pay any rent. The Trust does not carry this unpaid rent as a debt. Patricia Moreland, replaced by Holli Vara as Trustee in 1992, does “the books” for both defendants. Moreland is employed at Kenmore Management which keeps “the books” for both defendants but only for three years. The Trust operates primarily out of the offices of Kenmore Management, but even Vara III has a desk there.
At all times the Trust had the power to make repairs and to enter the premises. While the lease does not preclude Our House from making alterations, any structural repairs and alterations must be done with the Trust’s approval. Both defendants were aware of their legal obligation to seek and obtain legal “changes in use” of a property. Their awareness was established by testimony, admitted exhibits sent to and/or signed by Patricia Moreland (then Levins), former Trustee of the Trust and long-time bookkeeper and check bookkeeper and agent for both Defendants, as well as other exhibits, including ISD paperwork. The defendant Trust in 1982 and at other times sought to “change the use” of a different unit, 58 Gainsborough Street. Although the Trust bought the building 50-58 Gainsborough in 1981, the first year improvements were done was in March 1984 in the amount of $130,734.00, much of which was for “expansion.” A permit, including “change in use,” was applied for but then abandoned by owner. The Trust applied to change the florist use in #50 Gainsborough to the bar/restaurant use but then notwithstanding Vara Ill’s signature, that change in use was abandoned by the owner. Ms. Moreland admitted receiving Ex. 22, denying two permit applications on behalf of the Trust.
I accept that by 1984 both defendants intended to expand the bar/restaurant from 52 Gainsborough into 54 Gainsborough, which was then a laundromat. I accept that they then withdrew the “change in use” application but went ahead and expanded without the necessary building permits, all while knowing that a permit and Code-compliance was necessary. I accept that in 1987 when the defendants expanded #50 Gainsborough, a “change in use” building permit and a change in use of the beauty salon/florist was also necessary and intentionally avoided by both defendants. I also accept that the use of “bar/restaurant” *373 as a “place of assembly” would have required more “improvements” for the reason that public safety is more at issue in a bar/restaurant than in a beauty salon/florist. The defendants knew this and intentionally failed to seek or obtain the necessary building permits. I accept that, given the Lease language, the various identities and position with one or both defendants of those who applied for Permits, and the defendants’ familial relationships, both the owner of the building as well as the operator of the premises are responsible for this building’s non-compliance with the Building Code.
I also accept that on April 2, 1982 Patricia Moreland, as Trustee of the 50-58 Gainsborough Street Realty Trust, applied to combine 56 Gainsborough “with a contiguous building” and lot 58 Gainsborough “to be a restaurant . . . retail store and shoe repair shop.” This building" and lot 58 Gainsborough “to be a restaurant . . . retail store and shoe repair shop.” This application was denied as it was a non-conforming use. She made the same application for 58 Gainsborough with the same denial. The Trust appealed but both were denied on April 12, 1983. On April 20, 1983, Ms. Moreland, as Trustee of 50-58 Gainsborough St. Realty Trust, applied for two Permits, one for 56 Gainsborough and one for 58 Gainsborough, for Alterations, Repair or Change in Occupancy to “construct two openings in wall to connect two stores” for combined occupancy as Retail Store, Restaurant and Shoe Repair. Both were denied in May 1983 as “a change from one non-conforming use to another requires the approval of the Board of Appeal.” The City advised that the application for 56 and 58 Gainsborough required certified plot plans, floor plans and a zoning computation form and if no response with 30 days, the applications “will be deemed abandoned.”
The defendants have not made any other efforts, via the Inspectional Services Department, to combine the structures at 50-58 Gainsborough. In 1984, a builder applied to “Resash store front and cut two openings in brick wall that is non bearing” at 54 Gainsborough which application was approved. Other than wiring, electrical and gas fitting work, no substantial changes have been sought to be made to the premises at 50-54 Gainsborough by Permit Application.
Henry D. Vara signed a Permit Application to remodel 50 Gainsborough basement and first floor and to change occupancy to restaurant and dwelling unit, which application was “abandoned by the owner” after certified plot plans, zoning computation forms and floor plans were required by the City. A Certificate of Use of Occupancy issued for 54-56 Gainsborough for 4 apartments, store and shoe repair store.
In 1987, Gainsborough Rest., Inc. (sic), through a builder, sought a permit for a “new bar, hung ceiling, hardwood floor, new heat and air, new lighting, sprinkler and plumbing to bar” at 50A-50 Gainsborough. The permit issued on February 1988.
Defendant Trust sought in 1989 to combine 56 Gainsborough with 58 Gainsborough; that was refused in March of 1989 for, inter alia, non-conforming use.
In 1995 Gainsborough Rest, (sic) Inc. sought through its architect, Michael Lesburg, to construct a one-story addition at 50-50A Gainsborough which was refused; that appeal was dismissed without prejudice. That same addition was again sought for 50A-50E Gainsborough in July 9, 1998 and was refused as it was a non-conforming use. In 1998 the defendant, through its architect Michael Lesburg, sought to “provide access and expansion into the basement of its existing restaurant”; the application was refused in August 1998 as it was a non-conforming use; the defendant’s appeal was dismissed on December 1998.[8]
The City’s records do not show that any such permit has ever issued for these defendants to run Our House East out of 50-54 Gainsborough St. Due to the defendants’ failure to obtain the necessary permits/changes in use, the ISD records indicate that the City of Boston still understands that 54 Gainsborough Street is a store.
I accept that both Plaintiffs had a loving parent-son relationship with Jacob. I accept that both defendants enjoyed speaking with, laughing with, and spending time with Jacob. I accept that the grief they still feel on the loss of their son, though that grief is non-com-pensable,[9] is evidence of the loss they each feel from no longer having Jacob as their living son, not being able to hear his voice or receive his advice, comfort, counsel and consolation. I accept that this is a tremendous personal loss for each of them for the years since he died and the remainder of their lives, and award each $750,000.00.
Any “gifting” Lisa Klairmont was considering for Jacob had not yet been accomplished. Because it was only being considered, it is speculative and I do not include that in this award. In terms of the alleged economic loss, I do not credit plaintiffs’ expert. I accept that given Jacob’s background, supportive family and education, his estate likely has sustained some economic loss due to Jacob’s unfortunate death. However, given his “habituation to alcohol,” I discount by 50% even defendants’ expert economist’s loss of ($1,488,960/2 =) net earnings and benefits reduced to 12/07 value and award economic damages of $744,480.00. This discount of 50% is due to the effect of Jacob’s excessive drinking, amply established in the record, which likely would have substantially impacted his financial future as an adult.
I decline to award any money for any conscious pain and suffering of Jacob. It is unclear and speculative as to the extent to which he appreciated, during his *374 fall, that any injury would result. I accept that the calamitous injury he suffered likely was not contemplated by him during his fall.
The plaintiffs, through their attorney, sent three c. 93A letters to each of the defendants, Ex. 150 dated October 1, 2007, Ex. 153 dated March 4, 2008, and Ex. 156 dated June 4, 2009. Each letter complied with the requirements of c. 93A §9(3) specifying both 940 Code Mass. Regs. §3.16(3) and the flaws and Building Code violations in the stairs and stairway which caused the death of Jacob Freeman. Response letters by counsel for the defendants were sent and marked as Exhibits 151, 152, 154, 155, and 157. While continuing to deny liability, the defendants offered $75,000.00 in settlement if it would resolve all claims. Previously, in Ex. 151, only the Trustee defendants had made a $25,000.00 settlement offer, if it would resolve all claims, which offer was repeated by defendant Trustees in Ex. 155.
RULINGS OF LAW
The plaintiffs asserted claims for wrongful death, negligence, and violations of c. 93A. The jury returned verdicts for the defendants on the plaintiffs’ wrongful death and negligence claims. Notwithstanding the defendants’ arguments to the contrary, I am not bound by the jury’s findings on these two claims in my determination of the c. 93A claim. Chamberlayne Sch. v. Banker, 30 Mass.App.Ct. 346, 354-55 (1991) (“Although consistency and principles analogous to issue preclusion have a surface appeal, we think the broader scope and more flexible guidelines of c. 93A permit a judge to make his or her own decisions under c. 93A without being constrained by the jury’s findings”) (citation omitted). I reserved the 93A claim for myself, and asked the jury solely for a non-binding advisory opinion as to whether the defendants complied with the Building Code. The jury found that they did not. See International Totalizing Sys., Inc. v. Pepsico, Inc., 29 Mass.App.Ct. 424, 435 (1990), quoting Acushnet Fed. Credit Union v. Roderick, 26 Mass.App.Ct. 604, 606 (1988) (“Given the posture of this case, which included both common law actions and a statutory claim, the judge had the option of‘letting the jury find the facts for both claims, reserving to himself all aspects of the 93A claim, or asking for a non-binding advisory’ as to the latter”).
A. Laws Meant to Protect Public Health, Safety or Welfare
Chapter 93A forbids “(u)nfair methods óf competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . .” G.L.c. 93A, §2(a). A private individual “who has been injured by another person’s use or employment of any method, act or practice declared to be unlawful by section two or any rule or regulation issued thereunder” to bring suit in superior court for damages or equitable relief, or both. Id., §9(1).
The Attorney General may promulgate rules and regulations interpreting subsection 2(a). Id., §2(c). One such regulation states that an act or practice violates subsection 2(a) if “(i]t fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public’s health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection ...” 940 Code Mass. Regs. §3.16(3).
The Building Code, set forth at Title 780 of the Code of Massachusetts Regulations, is promulgated and interpreted by the Board of Building Regulations and Standards (“BBRS”), a division of the Massachusetts Department of Public Safety. G.L.c. 143, §93; see also Nextel Comm'n. of the Mid-Atlantic, Inc. v. Hanson, 311 F.Sup.2d 142, 146 (D.Mass. 2004); Fire Chief of Cambridge v. State Bldg. Code App. Bd., 34 Mass.App.Ct. 381, 384 (1993). The Building Code is clearly a “regulation[] meant for the protection of the public’s health, safety, or welfare .. . intended to provide the consumers of this Commonwealth protection . . .” 940 Code Mass.Regs. §3.16(3).
The Code is far-ranging in scope and effect, and there are criminal penalties for its violation. See, e.g., G.L.c. 143, §94 (“Whoever violates any provision of the state building code, except any specialized code as described in section ninety-six, shall be punished by a fine of not more than one thousand dollars or by imprisonment for not more than one year, or both, for each such violation. Each day during which a violation exists shall constitute a separate offense”). The inference is that the Code was, at least in part, intended to protect consumers not only from dangerous or unhealthy conditions, but also from unscrupulous individuals who use such conditions to their economic advantage, without regard for potentially endangering consumers. Compare McGonagal v. Home Depot U.S.A., Inc., 75 Mass.App.Ct. 593, 603 (2009) (state tax code did not qualify as “meant for the protection of the public’s health, safety, or welfare,” because it was not “intended to provide the consumers of this Commonwealth protection,” but instead “intend[ed] to raise revenues for the government and to collect them fairly from purchasers”).
The defendants argue that since the G.L.c. 93A claim is predicated on Building Code violations, it should be dismissed because the claim does not stem from an injury obtained due to insufficient or poorly maintained egresses while fleeing a fire. See Fox v. The Little People’s Sch., Inc., 54 Mass.App.Ct. 578, 582 (2002). The c. 93A claim is not, however, simply predicated on a Building Code violation as such, but instead, on willful and knowing violations of the Building Code spanning more than twenty years. Certainly, not all Building Code violations—indeed, very few— would give rise to c. 93A violations, because they *375 would lack the unfairness and deceptiveness present in this case.
In addition, the civil remedies available to private individuals for violations of the Building Code, under the Building Code itself,[10] do not “occupy the field” in terms of the remedies available to individuals aggrieved by a violation.[11] See McGonagal, 75 Mass.App.Ct. at 602 (The “pertinent statutes and regulations administered by DOR” effectively “occupied the field” in terms of the remedies available to an aggrieved sales tax payer). Similarly, the Building Code’s remedy is not inconsistent with the remedies available under c. 93A. The two statutes do not have “conflicting ends or means,” but rather are both geared, in part, towards protecting ordinary individuals from unscrupulous interests. See id. at 602-03 (“These remedies are potentially inconsistent with c. 93A remedies . . . The conflicting ends and means of the two statutory systems support the inference that the Legislature did not intend their application to the same conduct”). For these reasons, a violation of the Building Code may, therefore, constitute a violation of G.L.c. 93A, through 940 Code Mass.Regs. §3.16(3), in particular circumstances.
B. Defendants’ Liability
“Actionable c. 93A conduct must occur ‘in a business context.’ ” McGonagal, 75 Mass.App.Ct. at 599, citing Lantner v. Carson, 374 Mass. 606, 611 (1978). Here, the defendants, as owners/operators of the bar, and as owners of the land and building, are obviously engaged in “the conduct of [] trade or commerce.” G.L.c. 93A, §2(a). In addition, as stated above, Jacob’s presence in the “alcove” and on the stairs took place within the context of a commercial transaction, namely, Jacob’s patronage of the defendants’ bar, where his beers were bought and consumed.
As noted above, the jury found, and I accept, that the defendants violated the Building Code. In this case, the defendants’ Building Code violations were per se deceptive and unfair acts or practices. 940 Code Mass.Regs. §340; Hershenow v. Enterprise Rent-A-Car Co. of Boston, Inc., 445 Mass. 790, 798 (2006). A per se unfair and deceptive act under G.L.c. 93A, §2(a) is not, however, a “per se injury" under G.L.c. 93A, §9. Id., at 798 n. 17. “What the plaintiff must show is a causal connection between the deception and the loss and that the loss was foreseeable as a result of the deception.” International Fid. Ins., Co. v. Wilson, 387 Mass. 841, 850 (1983). I find that the plaintiffs here have met their burden of showing that the defendants’ deception and unfairness caused the death of their son and their loss due to Jacob’s death, as well as the economic damages suffered by Jacob’s estate.
Specifically, the defendants built and rebuilt the stairs without obtaining any Permits, and operated Our House without obtaining the required “change in use” from the City of Boston Inspectional Services Department. The defendants knew that the “change in use” was required; by failing to obtain it, they intentionally evaded important upgrade requirements that are designed to protect the public. In addition, despite knowing that the stairs were extremely dangerous and lacked proper permits, the defendants regularly permitted customers, like Jacob, to access the small “alcove” in between the stairs and the refrigerator. This was, in short, not an instance of “mere negligence.” Darviris v. Petros, 442 Mass. 274, 278 (2004) (“While G.L.c. 93A is a statute of ‘broad impact,’ the limits of which are notprecisely defined, a violation of G.L.c. 93A requires, at the very least, more than a finding of mere negligence . . .”) (citations omitted).
Considering the length of time the stairs were in place, in such non-Code compliant conditions, the defendants’ decisions to avoid obtaining the proper permits and to rebuild the stairs in non-Code complaint fashion constitute numerous deceptive acts and a willful and deliberate endangerment of the public over many years. As stated above, the defendants were very familiar with the permitting process, and the stairs were so obviously non-compliant that any reasonable person would have realized that the stairs presented a serious danger. Indeed, not only should the defendants have foreseen potentially serious injuries or even death as a result of their decades-long practices, but they were informed of at least two personal injuries, the Kitchen Manager’s and the liquor distributor’s. Despite that knowledge, they made no effort to remedy the situation or to correct the Code deficiencies.
The defendants knowingly, intentionally and willfully engaged in acts that violate c. 93A. In light of that fact, I award treble damages, plus attorneys fees and costs, to the plaintiffs. See G.L.c. 93A, §9(3) {“ [I]f the court finds for the petitioner, recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two . . .”).
C. The Wrongful Death Statute
The defendants argue that the Wrongful Death Statute preempts the plaintiffs’ c. 93A claim. “Massachusetts law will preempt 93A under only two very limited circumstances: (1) the conflicting Massachusetts law is self-contained, industry-specific, and provides for limited and specific remedies, and (2) the conflicting Massachusetts law specifically permits action contrary to the prohibitions of 93A.” Gilleran, The Law of Chapter 93A, §2.4 (2d ed. 2007). The wrongful death statute clearly does not fall into either of these two categories. See G.L.c. 229, §2.
The cases cited by the defendants are not on point, as they involve individuals attempting to assert com *376 mon-law wrongful death claims alongside, or instead of, a statutory wrongful death claim. See generally Hallet v. Wrentham, 398 Mass. 550 (1986); Owen v. Meserve, 381 Mass. 273 (1980).
Similarly, defendants’ argument that the plaintiffs are attempting to use c. 93A improperly in order to obtain wrongful death damages is misplaced. The plaintiffs seek damages under 93A for unfair or deceptive acts or practices. The fact that the unfair and deceptive acts or practices at issue caused Jacob’s death cannot bar a c. 93A claim predicated on such unfairness and deceptiveness.
D. Surviving the Death of the Party
The defendants claim that the c. 93A claim does not survive Jacob’s death, because claims under c. 93A are not specifically listed in the Survival Statute. G.L.c. 228, §1. It is, however, Jacob’s estate and his parents bringing the claim, seeking damages for harms done to them specifically. In any event, even if a party initiates a c. 93A claim and passes away while the case is pending, the 93A claim survives his death. Curtis v. Herb Chambers I-95, Inc., 75 Mass.App.Ct. 662 (2009), reversed on other grounds by 458 Mass. 674 (2011). Indeed, even punitive damages under G.L.c. 93A survive the party’s death. Id. at 674. Curtis appears to have abrogated the prior rule, as set forth in Harrison v. Protective Life Ins. Co., 379 Mass. 212 (1979), that compensatory damages súrvive death but punitive damages do not, since punitive damages are “personal” to the decedent. Curtis, 75 Mass.App.Ct. at 674. Curtis distinguished Harrison because, under c. 93A, the punitive damages are authorized by statute. “Multiple damages under G.L.c. 93A—even if characterized as punitive in the sense that that word was used in [Harrison]—are available in this case despite the fact that the original plaintiff has died. The multiple damages provisions of c. 93A are part of a legislative scheme designed to serve a broad public interest in the eradication of unfair and deceptive practices in trade or commerce.” Id. at 676-77. It is “consistent with the modern understanding of the systemic deterrent effect wrought by the availability of punitive damages, that claims for such damages are not merely personal.” Id. at 676. Thus, since a claim under c. 93A is not “merely personal” to the decedent, unlike, for example, certain torts, a claim under chapter 93A survives the decedent’s death. Compare G.L.c. 228, §1.
ORDER OF JUDGMENT
Judgment hereby enters for the defendants on the plaintiffs’ claims before the jury. On plaintiffs’ Chapter 93A claims, judgment enters in the amount of $2,244,480, which is trebled to $6,733,440.00, plus costs and attorneys fees. Plaintiffs must submit an affidavit of attorneys fees and costs within thirty days (by March 16, 2011) after which time the defendants will have thirty days (by April 16, 2011) to submit their opposition.

he record is unclear whether these beers were provided by the defendant bar/waitstaff directly to Jacob or via one of his friends. This issue is not material to this c. 93A claim.

Whether the staircase is non-Code compliant for having open sides is immaterial to the facts of this case.

I infer that there were not more falls on this dangerous staircase because those using them knew of the stairs and their condition, and of their consequent need to be careful.

he improper depth/width of the stair treads are also a Code violation but, given what I have already found, it is unnecessary to address whether this unsafe and improper width/depth of stair treads causally contributed to Jacob’s injury.

Though he was a “regular” at Our House, whether his “habituation to alcohol” was known to Our House is not necessary to address.

Either Jacob or his friends paid for their beers.

Plaintiffs Expert noted that the Code requirement of uniformity of risers and treads is important so that the stairs conform to a user’s anticipated gait movements through the staircase.

The Trustees for whom this application was filed were Franklin E. Melgar and Holli P. Vara. Franklin Melgar has also signed other permit application documents.

As it is not compensable under the Wrongful Death Statute, G.L.c. 229, §2, I decline to award damages for that category in this c. 93A action.

‘The owner, lessee, mortgagee in possession or occupant, being the party in control, of a place of assembly, theatre, special hall, public hall, factory, workshop, manufacturing establishment or building shall comply with the provisions of this chapter and the state building code relative thereto, and such person shall be liable to any person injured for all damages caused by a violation of any of said provisions.” G.L.c. 143, §51.

The Building Code, in G.L.c. 143, §51, contains “facially broad language” giving civil remedies to persons injured by code violations. Fox, 54 Mass.App.Ct. at 582. The Legislature modified §51 in St. 1972, c. 802, §28, “so that, in material part, it read as it reads today.” Fox, 54 Mass.App.Ct. at 581. The Supreme Judicial Court, however, has construed the language to apply only to those individuals hurt by insufficient or poorly maintained egresses while fleeing a fire, as in the previous version of §51. Id., at 581-82 (“Notwithstanding any conclusion we might reach were we writing on a clean slate, controlling cases regard the pedigree [i.e., the prior statute] of c. 143, §51, as a limitation on its facially broad language. Accordingly, the ‘appropriate circumstances’ for recovery under §51 are those in which a violation of the State Building Code results in an injury to someone fleeing a fire”). But see Stuart v. Merloni, 17 Mass. L. Rptr. 453; 2004 Mass.Super. LEXIS 75 (March 22, 2004) (arguing, first, that when the Supreme Judicial Court said, in dicta, that recovery could only be available to those injured while fleeing a fire, it was inadvertantly relying on a case that had interpreted a prior version of the statute, and second, that Foxcompounded the error by viewing the Supreme Judicial Court’s dicta as controlling law).